WARNER, J.
Raymond Kelly appeals his conviction on multiple counts of armed sexual battery, kidnapping, robbery, and impersonating an officer. He claims that the trial court erred in denying his motions to suppress evidence found in his office desk drawer, as well as a backpack in his home, both places having been searched by the authorities without a warrant. We hold that the court did not err in denying the suppression of evidence from his office desk, as Kelly had no expectation of privacy and his employer gave permission for the search. As to the search of the backpack, the detectives did not have consent to search the backpack, but the admission of its contents constitutes harmless error. In addition, Kelly contends that ineffective assistance of counsel appears on the face of the record, where his counsel failed to object to the admission of Kelly’s statement where he invoked his right of silence. This issue cannot be addressed, however, on direct appeal. We affirm.
The incident giving rise to the charges, the facts of which we briefly recite, began with the victim seeking a ride on a street corner after having left a party. A man approached her, claiming to be a detective, and offered assistance. Instead, he placed *821 her in his car, blindfolded, bound and gagged her, and drove her to another area where he committed various sexual batteries upon her, taking pictures as he did so. He then let her go. Eventually, the police found her and took her to a sexual assault center. Later, after they had developed a suspect, they showed her a photo lineup where she positively identified Kelly as her attacker. DNA swabs taken from her body proved a positive match for Kelly’s DNA.
Police connected Kelly to the crimes through papers left in a dumpster two blocks from the crime scene of a different sexual battery victim. The papers identified Cynthia Morales (Kelly’s girlfriend). Officers located Morales who identified Kelly in a surveillance photograph taken at a nearby gas station. Morales consented to a search of her home, and evidence was taken, including several cameras.
As a result, police arrested Kelly, and he was taken to the police station where he was given Miranda warnings and talked to police. In that statement Kelly told the officer that he had met a woman at the beach who had posed nude for him. The victim looked like the woman he had met, but he denied having sex with her. He consented to a DNA sample, a computer search, and a camera search. In his briefcase, which was in his possession at the time of the interview, the officers found the victim’s camera and discovered pictures from that camera on his laptop computer.
Kelly testified at trial, denying all of the charges, and claiming that the pictures on the laptop were put there by a friend. The jury found him guilty, and the court convicted him and sentenced him to life in prison as a habitual felony offender and dangerous sexual offender, resulting in this appeal.
Kelly claims that the trial court erred in denying his motions to suppress evidence taken from his office desk and the house where he lived. The trial court’s ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court’s ruling. Pagan v. State, 830 So.2d 792, 806 (Fla.2002). While the appellate court is bound by factual determinations which are supported by competent substantial evidence, it reviews mixed questions of fact and law de novo. Cote v. State, 14 So.3d 1137, 1139 (Fla. 4th DCA 2009).

Property Seized From Workplace

Kelly worked as a front desk manager at a local hotel. He shared an office with another employee where he had an assigned desk and desktop computer. Other employees would come into the office to use office equipment or obtain paperwork. Although other employees generally did not go into Kelly’s desk, his desk had been searched by others on a few occasions, when he was not present, to locate missing paperwork or keys.
The general manager of the hotel testified that around the time that the police called regarding Kelly, Kelly was fired because he had failed to show up for work for three days without contacting the hotel. Company policy required termination in that instance. Police called the hotel and asked to search Kelly’s desk area, telling the manager that Kelly was in jail. The manager gave his permission. When the officers arrived the next day, they searched the desk. In the top drawer, they found a Blackberry phone, which belonged to the victim, and a camera. A box underneath the desk contained material associated with the crime scene of two *822 different incidents for which Kelly was being investigated. From the outside of the box, markings identified it as being from the business where two of the crimes occurred. A bag with a laptop in it was also found.[1] The detectives who searched the desk testified that the general manager had given them permission to search the area, and they proceeded on that authority.
Kelly moved to suppress the evidence seized in the search of the desk. He claimed at the hearing that the general manager did not have the authority to consent to the search of his desk, even though Kelly was no longer an employee of the hotel. In denying the motion, the trial court made findings of fact and concluded that Kelly had no expectation of privacy. The court specifically found:
Based on the evidence presented, which includes the testimony of the witnesses, this Court finds that the Defendant had no expectation of privacy in the office which he shared with another employee. He had been previously terminated from employment before the detectives arrived to search the office. Other employees and his supervisor had unlimited access to his office and inside the desk.... [T]he Hotel’s general manager, testified ... that the desk, including the drawers, was accessible to other employees. The desk was not locked.
The court also found that the general manager, as the direct supervisor of Kelly, had the authority to consent to the search of the workplace, and that the police acted on his apparent authority to grant permission.
State v. Young, 974 So.2d 601 (Fla. 1st DCA 2008), aptly summarizes the legal principles involved in analyzing whether a legitimate expectation of privacy exists in an office setting:
To invoke the protection of the Fourth Amendment, a criminal defendant must establish standing by demonstrating a legitimate expectation of privacy in the area searched or the item seized. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). A legitimate expectation of privacy consists of both a subjective expectation and an objectively reasonable expectation, as determined by societal standards. Smith, 442 U.S. at 740, 99 S.Ct. 2577. The reasonableness of an expectation of privacy in a particular place or item depends on context. O’Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Specifically, the reasonableness of an employee’s expectation of privacy in his or her office or the items contained therein depends on the “operational realities” of the workplace, id. at 717, 107 S.Ct. 1492, and not on legal possession or ownership. Mancusi v. DeForte, 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). The likelihood that a person has an objectively reasonable expectation of privacy in an office setting is increased where the area or item searched is “reserved for [the defendant’s] exclusive personal use.” See id. at 368, 88 S.Ct. 2120. Other factors that have been considered in determining the legitimacy of an expectation of privacy in an item seized from an office include the employee’s relationship to the item, whether the item was in the employee’s immediate control when it was seized, and whether the employee took actions to maintain a sense of privacy in the item. United *823 States v. Anderson, 154 F.3d 1225, 1232 (10th Cir.1998). Many times, an employee may have a legitimate expectation of privacy in his or her personal office and in personal items stored in a desk or file cabinet. See O’Connor, 480 U.S. at 716-18, 107 S.Ct. 1492.
Id. at 608. In Young, the court determined that a pastor had a legitimate expectation of privacy in his private office at the church where the office was locked with a key different from the church master key and only he and the church secretary had keys to the office. No one was permitted to enter the office without the pastor’s permission. Likewise, in Bateman v. State, 513 So.2d 1101 (Fla. 2d DCA 1987), the court found that an employee had a legitimate expectation of privacy in his desk drawer of a locked office, where he had not shared his desk with anyone for the entire nineteen years he had worked for the employer.
Closer to the facts of this case, however, is People v. Crawford, 632 P.2d 626, 628 (Colo.App.1981), where the court determined that an employee who shared an office with other employees had no expectation of privacy, and it approved a war-rantless search of the desk and file cabinets that he used. Likewise, in People v. Duvall, 170 Mich.App. 701, 706-07, 428 N.W.2d 746, 748-49 (1988), a deputy sheriff was held not to have a legitimate expectation of privacy in his desk in an office he shared with other officers.
In this case, the trial court’s findings that Kelly had no expectation of privacy is supported by the facts as found by the trial court, to which we defer. Kelly shared the office with another employee, and other employees had full access to the office. No locks were on the desk, and the desk drawers were accessible to others who, upon at least some occasions, did look through the desk. Kelly’s permission was not always sought in going through his desk. Under these circumstances, applying the law to the facts as found by the trial court, we conclude that Kelly had no legitimate expectation of privacy. Therefore the search of his desk without a warrant did not violate the Fourth Amendment, and the court did not err in suppressing the Blackberry admitted into evidence.
In addition, the trial court found that the general manager, Kelly’s direct supervisor, consented to the search, thus providing authority to the officers who conducted the search. The government may justify a warrantless search by proving “permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.” United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Common authority “rests ... on mutual use of the property by persons generally having joint access or control for most purposes.... ” 415 U.S. at 171 n. 7, 94 S.Ct. 988.
In considering the issue with respect to employer/employee relationships, “even where a private employee retains an expectation that his private office will not be the subject of an unreasonable government search, such interest may be subject to the possibility of an employer’s consent to a search of the premises which it owns.” United States v. Ziegler, 474 F.3d 1184, 1191 (9th Cir.2007). Here, the general manager consented to the search. The general manager had ultimate control over all premises. He could authorize the search of the premises, including an employee’s desk, as he had done in the past to search for missing documents or keys. Thus, the trial court did not err in determining that the consent of the general *824 manager provided authority to the officers to search Kelly’s desk.
For both of the reasons given by the trial court, we conclude that the warrant-less search did not violate the Fourth Amendment.

Search of Home

Kelly lived with his girlfriend Cynthia Morales in her home. When the officers associated her with Kelly, they asked to search her home. She consented, and the officers searched and seized cameras, computers, and items connected with various crimes they were investigating. Two days later, after listening to a tape recording of a conversation between Kelly and Morales at the jail, the officers heard Kelly tell Morales to get rid of a red backpack. They asked Morales if they could search her home again. She consented and let them search the area. They found the red backpack in the garage and searched it, finding evidence connected with this crime.
At the hearing on the motion to suppress the evidence found as a result of the two home searches, Morales testified that she felt she had to consent and was nervous and scared. As they searched the house, she said she told them which items belonged to Kelly. The officers, on the other hand, generally testified that she had freely consented to the search of her home and signed a consent to search form. She never told them they could not search in any particular area or object, and she did not object. They both admitted, however, that she would identify what belonged to Kelly and what belonged to her. They testified that Morales never asserted that she did not have control or authority over any of the things they took. According to one of the detectives, Morales had said that they should take anything that was there because whatever they didn’t take she was “donating,” and she asked if she could throw it away or get rid of it. The trial court made findings of fact that Morales had authority to give consent to the search of her home and that her consent was free and voluntary. The court did not distinguish between consent to search the home and consent to search the red bag or any of the other personal property within the home. The court denied the motion to suppress.
The Fourth Amendment prohibition against warrantless searches of an individual’s property does not apply when officers obtain consent either from the individual whose property is to be searched or from a third party who possesses “common authority” over the premises. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). The Supreme Court defined what common authority meant in Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. at 993, in which the court stated:
Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent ... rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
Because Morales was the owner and co-resident of the house, it is undisputed that she would have “common authority” to permit the search of her home. That does not, however, provide consent to search Kelly’s closed red bag inside of her home unless her authority over it may be established.
*825 Judge Griffin thoroughly analyzed the issue of apparent authority to consent to the search of personal property within premises over which common authority may be exercised in Marganet v. State, 927 So.2d 52 (Fla. 5th DCA 2006). In that case, the girlfriend of the defendant gave consent to the police to search a hotel room where both she and the defendant were staying. She told the police that drugs would be found in the defendant’s shaving kit inside his suitcase. The officers opened both the suitcase and the shaving kit and found drugs. Although the court found that the girlfriend had actual authority to consent to the search of the hotel room, this finding did not resolve the question of whether she could consent to the search of the suitcase and shaving kit.
In the opinion, Judge Griffin found that two lines of cases have developed on the issue. Some courts permit the search of personal property on the following rationale:
A number of courts appear to hold that common authority over the premises is sufficient to authorize a third party to consent to search personal property found on the premises. Most courts adhering to this viewpoint reason that the right of common authority over the premises establishes a right to access all property on the premises, at least in the absence of a contrary showing.
Id. at 56 (footnotes and case citations omitted). The other view, which Marganet attributes as the majority position, finds that the common authority over the premises does not, in and of itself, permit search of any personal property contained within the premises:
[Bjased on Matlock, most courts find that there is no right on the part of a third party to consent to a search of personal property belonging to another person unless there is evidence of. both common authority over and mutual usage of the property.... This viewpoint appears to be based on the language contained in Matlock, that “the right to consent rests not on the law of property but rests rather on mutual use of the property by persons generally having joint access or control for most purposes .... ”
Id. at 57-58 (emphasis in original) (citations omitted). Specifically dealing with the issue presented in this case, Judge Griffin further explained that the state must do more than assume that joint control over the premises is sufficient to provide authority to consent to the search to any personal property on those premises, as the officers in this case assumed: “When police are told by a third party that the property belongs to another, the officers are obligated to make inquiries sufficient to establish that the person consenting to the search has both common control over the property and mutual use of it.” Id. at 58 (citations omitted). Citing to Silva v. State, 344 So.2d 559 (Fla.1977), Judge Griffin concluded that Florida followed the majority position “that something more than mere joint control of the premises must be shown before a person has the right to consent to a search of property personal to another.” Marganet, 927 So.2d at 59. Silva stands for the proposition that a wife or girlfriend could not consent to the search of a husband/boyfriend’s personal effects in the joint premises where they reside. 344 So.2d at 564. “Silva suggests that a third party’s consent to search may be ineffective with respect to property clearly identifiable as belonging to another, in the absence of evidence of mutual use of the property.” Marganet, 927 So.2d at 60.
Summarizing, Marganet explained that the state has the duty to prove through specific facts that the third party has the authority over the particular object to be searched:
*826 Taken collectively, these cases suggest that a number of factors bear on the rights of a third party to consent to a search of a container. They include such factors as whether the property clearly belongs to one person; whether it is generally used by one person, whether it is freely accessible to others, whether the container is closed or open, whether it is locked or unlocked, and whether orders have been given not to open the container. The relationship of the parties and the nature of the property may also have a bearing on the right to consent to a search. As was pointed out in United States v. Basinski, 226 F.3d 829, 834 (7th Cir.2000), “it is less reasonable for a police officer to believe that a third party has full access to a defendant’s purse or a briefcase than, say, an open crate.” Moreover, a wife may have a right of access to her husband’s shaving kit that a roommate or girlfriend does not. The burden is on the State to show that police were given free and voluntary consent to enter the premises by someone with actual or apparent authority to do so. Williams v. State, 788 So.2d 334, 336 (Fla. 5th DCA 2001). Thus, when making entity or conducting a search, an officer must elicit sufficient facts from which he or she can determine that the person consenting to the search has common authority over the premises or property to be searched. Saavedra v. State, 622 So.2d 952, 959 (Fla.1993).
Id. at 60-61 (emphasis supplied).
Applying Marganet to this case, we conclude that the search of the red bag violated the Fourth Amendment. While Morales had actual authority to consent to the search of her house which she shared with Kelly, the officers did not establish that she had authority to consent to the search of the red bag found in the garage of the home. In fact, the officers testified that they believed that Morales’ consent to search her home allowed them to search anything within it. They were very much mistaken in their view of their legal authority. They did not elicit any facts to show that Morales had authority to permit their search of the red bag. In fact, during both searches of the home, Morales repeatedly identified property belonging to Kelly. The officers did not attempt to establish that Morales had joint control over those items, and indeed her statements to them showed that she did not have anything to do with the red bag. Under these circumstances we cannot conclude that Morales had authority to consent to the search of the red bag.[2] Therefore, the search violated the Fourth Amendment.
Nevertheless, we conclude that the admission of the evidence in the red bag was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). The relevant evidence from that bag constituted flex cuffs and blue tape which were used by Kelly on the victim during the sexual battery. Pictures admitted in evidence from Kelly’s computer also showed the victim with blue tape on her eyes and flex cuffs on her wrists. In addition, Kelly’s DNA was found on her body, and her camera and Blackberry were found in his possession, thus tying him to the victim. That Kelly had possession of similar flex cuffs and blue tape in his backpack did not add material evidence to the state’s case that was not already confirmed with other evidence. Despite the Fourth Amendment violation, we conclude that the error does not merit reversal.

*827
Ineffective Assistance of Counsel

Kelly argues that his counsel was ineffective for failing to file a motion to suppress statements made after Kelly exercised his right to remain silent during his interrogation by officers. Generally ineffective assistance of counsel is not cognizable on direct appeal; the exception is where ineffectiveness is apparent on the face of the record. Mansfield v. State, 758 So.2d 686, 642 (Fla.2000). Here, we cannot say that ineffectiveness is so readily apparent that we should reverse without further development in postconviction proceedings. The statement, “I’m talking to you no more,” appears close to that deemed equivocal in State v. Owen, 696 So.2d 715, 717-18 & n. 4 (Fla.1997) (“I don’t want to talk about it.”). Postconviction proceedings are more appropriate to flesh out whether the failure to object constitutes deficient performance by the attorney and whether it was prejudicial to the outcome. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
POLEN and GERBER, JJ., concur.

. Although the officers opened the bag to obtain the laptop, before examining the laptop, they obtained a search warrant. The laptop seized at the hotel, however, did not have any incriminating evidence on it. As far as we can tell from the record and the briefs, nothing from that particular laptop was admitted in evidence.

. Neither at trial nor on appeal does the state argue that Kelly’s direction to Morales to get rid of the red bag constitutes an abandonment of it such that Fourth Amendment protection would not apply. See U.S. v. Basinski, 226 F.3d 829, 836-38 (7th Cir.2000).