584 So.2d 1073 (1991)
Herman Jerome BURNS, Appellant,
v.
STATE of Florida, Appellee.
No. 90-1870.
District Court of Appeal of Florida, Fourth District.
August 7, 1991.
Rehearing Denied August 30, 1991.
*1074 William R. Amlong of Amlong & Amlong, P.A., Fort Lauderdale, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellee.
FARMER, Judge.
Burns's convictions of attempted second degree murder with a firearm, resisting arrest with violence with a firearm, carrying a concealed weapon and depriving an officer of his weapon bring us issues as to the admissibility of statements made while undergoing medical treatment and thus under the effects of narcotizing drugs, the sufficiency of the evidence, and the propriety in sentencing of considering injury of a victim caused by an arresting officer. We affirm on all issues save one.
Two police officers responded to an armed robbery broadcast and encountered Burns in a convenience store parking lot. As soon as he saw the officers, he ran away. The officers gave pursuit and their police dog caught and bit him and knocked him to the ground. Burns jumped up and begged the officers to shoot him because he did not want to return to prison, while they attempted to put handcuffs on his flailing arms. One officer struck Burns on the head with his weapon, and in the act dropped the gun. Burns immediately picked it up and pointed the weapon at that officer while making a motion to squeeze the trigger. The other officer then drew his weapon and fired six times, hitting the first officer once and Burns five times in the chest and stomach.
Burns was taken to a hospital emergency room, where he lay on a gurney. An officer approached him and administered Miranda warnings, which Burns said he knew by heart. Burns made some statements to this officer about going through hard times and being unable to care for his girlfriend and throwing the gun out of the car. Then he was given medical treatment, including 50 milligrams of demerol for pain.
Slightly over an hour after receiving the demerol, Burns was approached by still another officer who, after first asking him if he understood his rights and that he was talking to a police officer, asked him why he had shot the first officer. Burns responded that he shot the officer because he was beating him. He also answered other questions propounded by this last officer, including giving his social security number. At trial Burns testified that, while he did not pull the trigger or attempt to shoot the officer, he "just gave him the attitude that if you hit me again or if you come at me I'm going to shoot you." It was only later that the police learned that the first officer was injured by a bullet from the gun of the second officer.
Burns later moved to suppress his statements. One of the interrogating officers testified that shortly before the administration of the demerol, Burns had appeared "fairly coherent". The other officer testified that about one hour after the demerol Burns "definitely knew what was going on" and appeared "alert and coherent." A nurse testified that Burns acted as though in shock and appeared to have a lot of pain. She added that because demerol gives a patient an "altered mental state" the hospital has a policy not to obtain consents for surgery after demerol is given.
A psychiatrist testified that Burns's blood pressure varied radically from 90 to *1075 210 and that he had lost 700 cc's of blood while he was in the emergency room. She added that the pain affected his ability to think. She said that demerol clouds the "conscience" ["conscious"?] and gives an effect of euphoria. Burns's physical condition would have enhanced the narcotic properties of the drug, she testified, which has a duration of 2 to 4 hours. She also said that it would have slowed his thought processes and cognitive functions. She opined that while he might be able to recite "overlearned" information, like a social security number, he could not have understood his Miranda rights.
The trial court denied the motion to suppress. With regard to the statements about hard times, the girlfriend and discarding the gun, the court found that they were voluntarily made after proper Miranda warnings and that Burns understood his rights. With regard to his later statement while under the influence of demerol, the court again found that the statement was voluntary. The court pointedly observed that, though under the influence of demerol, Burns ended the questioning by invoking his right to remain silent.
On appeal, Burns argues that it was error not to suppress his statements, especially after he had been given the drug. In DeConingh v. State, 433 So.2d 501 (Fla. 1983), cert. den., 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984), the court held that intoxication at the time of confession does not bar the confession unless the defendant is intoxicated to the degree of "mania" or is unable to understand the meaning of his statements. There the defendant had been hospitalized and given thorazine and valium by her physician shortly after shooting her husband. The court considered the effect of the drugs only in light of the circumstances  giving a rights form to the defendant in her hospital bed without making any effort to determine if she understood it, coming into the hospital room with another deputy with a tape recorder, and using his previous friendship with the defendant to suggest that his questioning was out of concern for her  to invalidate the confession. The case certainly does not suggest a per se rule that all confessions obtained after the administration of narcotic drugs are inadmissible.
The court in DeConingh did not define or explain the term "mania", certainly now an unscientific word to describe mental incapacity. It originated in this state in Lindsey v. State, 66 Fla. 341, 63 So. 832 (1913), where the defendant in a "very drunken condition" told the man who loaded him into the buggy that he had indeed shot the deceased. The issue was whether the defendant was induced to make the statement by the man's previous comment that it looked like defendant had missed the decedent, to which defendant had replied: "I didn't miss him; I shot him right under the shoulder; about the time I pulled the trigger he turned." The court agreed that the statement was not made involuntary simply by virtue of defendant being "very badly intoxicated." 63 So. at 833.
In adopting the "mania" rule, our supreme court cited cases using a similar rule from Louisiana, Arkansas, Alabama, Minnesota, Massachusetts, Texas, New York and Iowa. To those we can add the more recent decisions in State v. Kelly, 376 A.2d 840 (Me. 1977), and State v. Logner, 266 N.C. 238, 145 S.E.2d 867 (1966), cert. den. 384 U.S. 1013, 86 S.Ct. 1983, 16 L.Ed.2d 1032 (1966). In Kelly the court explained that the mania rule really means that:
A person under the influence of alcohol waiving constitutional rights is legally competent to do so if, despite the degree of intoxication, he is "aware and able to comprehend and to communicate with coherence and rationality."
376 A.2d at 849. See also State v. Hazelton, 330 A.2d 919, 924 (Me. 1975). On the other hand, in Logner the court defined "mania" even more narrowly to mean "so drunk as to be unconscious of the meaning of his words." 145 S.E.2d at 871.
We think the Kelly definition comes closest to what the Florida Supreme Court had in mind. The inquiry should be centered on whether the defendant is aware and able to comprehend in a general way what he is doing and to communicate with *1076 coherence and rationality. By "rationality", we mean whether the defendant's responses or communications have a contextual relationship, not whether it is objectively reasonable for a person in the circumstance of the defendant to make the statement sought to be admitted.
And, of course, the influence of drugs or alcohol[1] is only one of the factors to be considered in the "totality-of-the-circumstances" mosaic to determine voluntariness. See Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Recognizing that the issue of voluntariness is ultimately a legal question to be determined under federal constitutional standards, Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991), we must still defer to the factual findings of the trial judge who observed the witnesses first-hand. Judged by these standards, we are unable to say that the trial court erred in refusing to suppress a confession given while under the influence of demerol.
The quite specific factual findings pointedly include details that show more than the stupefied ramblings of one under the control of chemicals. Appellant was "alert and coherent" and had no difficulty speaking. He was aware of his surroundings. He even ended the questioning by invoking his right to refuse to answer more questions.
Certainly the trial judge could decide to give little weight to the opinion of the psychiatrist, especially in light of appellant's freely-given statements before the administration of demerol and his later invocation of the right to silence after he had made the statement about shooting the officer. Russo v. Heil Construction Inc., 549 So.2d 676 (Fla. 5th DCA 1989). It is therefore simply impossible to conclude on this record that no reasonable judge, having due regard for the constitutional requirements, would have decided the voluntariness issue as Judge Dimitrouleas did.
There is no error in the sufficiency of the evidence to support the charge of attempted second degree murder. Numerous witnesses, some other than police officers, saw him pick up and point the gun at the officer who dropped it. Section 777.04(1), Florida Statutes (1989), expressly includes the words "any act" in defining the crime of attempt. Wielding and pointing a handgun at someone is an act teeming with consequences and is reasonably understood as an act toward the commission of murder. Johnson v. State, 486 So.2d 657 (Fla. 4th DCA 1986). Indeed we can think of few single acts more calculated to advance an enterprise in murder or violence.
We should also have been prepared to affirm the conviction for resisting arrest with violence while carrying a firearm. As it happens, however, the information charged this offense as against the officer who shot appellant rather than the officer who was shot. We have personally combed the record for evidence that appellant resisted the shooting officer with any violence, and we were unable to find any support for the charge. In fact the officer who was described in the information as being resisted with violence expressly testified that he could not recall if appellant ever actually struck him; nor could he even say whether appellant was attempting to strike him with his hands or merely moving his arms about. R. 324-325. We must therefore reverse the conviction for resisting with violence.
Last, appellant challenges the propriety in sentencing of assessing points against him under the guidelines for victim injury caused directly by one of the arresting officers. The rule says that "[v]ictim injury shall be scored for each victim physically injured during a criminal episode or transaction." Fla.R.Crim.P. 3.701(d)7. There is nothing in the text of the rule to suggest that an arresting officer cannot be a "victim" of physical injury within its meaning. In fact the Committee Notes to the rule include the following:

*1077 (d)(7) This provision implements the intention of the commission that points for victim injury be added for each victim injured during a criminal transaction or episode. The injury need not be an element of the crime for which the defendant is convicted, but is limited to physical trauma. However, if the victim injury is the result of a crime for which the defendant has been acquitted, it shall not be scored. [e.s.]
In Harris v. State, 513 So.2d 169 (Fla. 5th DCA 1987), the court approved the assessment of victim injury points against a defendant whose co-defendant actually caused the injury. The court observed that section 777.011, Florida Statutes (1989), explicitly allows vicarious attribution of the responsibility for the injury to the co-defendant. We follow the reasoning of the Fifth District. There is no error in making Burns bear more severe punishment for the injuries suffered by an officer in arresting and subduing him.
We thus affirm his conviction for attempted second degree murder with a firearm, carrying a concealed weapon and depriving an officer of his weapon. We reverse his conviction for resisting arrest with violence while carrying a firearm.
AFFIRMED IN PART AND REVERSED IN PART.
DOWNEY and GUNTHER, JJ., concur.
NOTES
[1] We draw no significant distinction, for voluntariness purposes, between alcohol and narcotic drugs, or other mind-altering substances. Neither, it seems, did the supreme court in Atkins v. State, 452 So.2d 529 (Fla. 1984), where both alcohol and a qualude were involved. The issue does not turn on how the substance works on the mind, so much as whether its effects include an unavoidable destruction of volition.